IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**JOSÉ GUILLERMO PEÑA-MALDONADO**,

    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 19-1971 (BJM)

**OPINION AND ORDER**

    José Guillermo Peña-Maldonado ("Peña") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Peña contends the Commissioner's decision should be reversed because the administrative law judge ("ALJ")'s residual functional capacity ("RFC") finding and Step Four non-disability determination were not supported by substantial evidence. Docket Nos. 1, 10. The Commissioner opposed. Docket Nos. 9, 11. This case is before me on consent of the parties. Docket Nos. 4-7. After careful review of the administrative record and the briefs on file, the Commissioner's decision is **affirmed**.

**STANDARD OF REVIEW**

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v.*

*Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national

economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, medical opinions, and self-reported symptoms and limitations as contained in the Social Security transcript at Docket No. 12.

Peña was born on November 13, 1960, completed high school, understood and spoke English, and worked as a U.S. Army mechanic and supervisor for twenty-five years and as a real estate assistant appraiser for seven years. On March 3, 2017, Peña applied for disability insurance benefits, claiming to have been disabled since March 30, 2016 (alleged onset date) at age 55 (person of advanced age, *see* 20 C.F.R. 404.1563(e)) due to sleep apnea, back problems, high blood pressure, and an anxiety disorder. Peña last met the insured status requirements on September 30, 2016 (date last insured). Social Security Transcript ("Tr.") 43-44, 52-55, 61, 68, 203-204, 212, 309-313, 321, 325-326, 383.

*Treatment Record*

Peña would have routine check-ups performed and has received treatment for diverse conditions under the auspices of the Veteran's Administration Hospital ("VA") since his retirement from the Army in 2004. Listed conditions include left cheek basal cell carcinoma (starting 2018), generalized anxiety disorder and recurrent major moderate depressive episodes, sleep apnea, asthma, back pain, high blood pressure, diabetes mellitus, hearing deficit and subjective tinnitus, benign prostate gland enlargement without urinary obstruction, arthralgia, knee injury, and varicocele. Tr. 329, 363-364, 384, 485, 948-956, 1240-1245, 1324-1331, 1358. The bulk of the VA evidence in the transcript is for psychological and psychiatric treatment. I will focus on reviewing the relevant evidence leading up to the date last insured. Upfront, I note that all appointments up

to this date are outpatient. I found no evidence of hospitalizations. I will first discuss the chronological evidence of Peña's physical conditions, followed by his mental conditions.

January and February 2011, and March 2012 notes indicate normal examination of lungs, abdomen, extremities, and musculoskeletal and neurologic systems. His hypertension was controlled with medications, with a good response. He was asymptomatic to allergic rhinitis and prostate disease. His asthma was not exacerbated and did not need medications at that time. Tr. 400-403, 418-422, 450-451. March 2012 notes show that Peña felt mild low back pain. Tr. 451.

Peña experienced intermittent left side chest pain in February 2013, for which he went to the emergency room and was given medications. His pain level was a three out of ten. Cardiac silhouette was within normal limits in size, and there were no acute infiltrates or effusions. Tr. 627-642, 653.

For complaints of right shoulder pain and sensation of a loose joint, x-rays dated February 2013 showed minimal right acromioclavicular degenerative osteoarthritis. Tr. 609, 627. For right knee joint crepitance, mild pain, and sensation of instability, an MRI and x-rays showed no significant joint or bony abnormalities. Tr. 627, 670. In March 2013, Peña requested conservative treatment for his right knee chondromalacia. He reported feeling better with some pain when going up and down stairs, and using anti-inflammatory medications on and off with satisfactory results. He used a treadmill for walking exercises and ambulated without the use of supports. Peña was discharged from orthopedic treatment. Tr. 491, 650. There is also evidence of mild dorsiflexion of the distal interphalangeal joint and mild degenerative changes of the foot, and calcific tendinopathy of the calcaneal bone with a note of significant abnormality that needed attention. Tr. 605.

Between 2013 and 2014, sleep studies were performed due to loud snoring. A sleep study performed over two nights in February 2014 concluded that Peña had severe obstructive sleep apnea. Tr. 544-546, 646.

For low back pain complaints in 2013, exams were positive for spine and femoral neck osteopenia, with "no alert required." Exam of the radius and ulna was negative for osteopenia. Tr. 607, 627. Low back pain persisted, and a lumbar spine MRI was performed on May 23, 2014, revealing mild spondylosis, disc desiccation changes at the L5/S1 disc, a small concentric bulging disc and moderate canal narrowing at the T11/T12 level. Tr. 605. In September 2016, Peña felt a generalized pain of three out of ten, but notified that he was taking his medications as ordered without adverse reactions. He was feeling and sleeping normally. Tr. 1003.

On June 8, 2016, Peña underwent a preventive medicine screening with primary care physician Dr. Alexis Vera. PTSD and alcohol screening tests were negative. Review of all body systems was normal. A musculoskeletal examination revealed intact range of motion, adequate muscle tone, and no deformities. As to the neurological review, he showed no gross motor and sensory deficit. Extremities were normal. His hypertension was controlled. Diet was recommended for his hypertension, hyperlipidemia, and gastroesophageal reflux disease. His low back pain and chronic hip pain showed no red flags to evaluate and was controlled. Peña was using a positive airway pressure ("PAP") therapy device for his sleep apnea. Left foot pain was stable and under care. Medications, diet, and exercise were discussed. Tr. 1020-1029. For Peña's major depression and anxiety disorder (discussed below), Peña stated not experiencing recent exacerbation and that his condition was stable. Tr. 1026.

On September 8, 2016, Dr. Jesús Casal-Hidalgo, pulmonary care physician, noted that Peña was not in respiratory distress. Examination was normal. Notes indicate that Peña was not using his continuous PAP ("CPAP") machine as instructed. Comorbidities and risk factors were discussed. Refills were provided. Tr. 1005-07.

Peña was also treated for major depressive disorder (recurrent episode moderate without psychosis) and unspecified anxiety disorder. Peña started attending appointments at a rural VA clinic in January 2011, and on initial assessment, generalized anxiety disorder was suspected. Tr. 386-387, 401, 411-417, 1243.

2011 to 2013 notes show that Peña was stable and had good compliance with psychotropic medications with no side effects. Medications would be adjusted on a need basis. He also benefited from individual and group therapy and anger management sessions. Tr. 398-399, 418-519. Progress notes from mid-2013 to 2016 indicate Peña had ups and down in his mood because of stressors such as the family situation of his mother's care, guilty feelings towards his family (sons, wife, mother), and marital issues. His insight was at times fair in 2013. Tr. 532-544, 546-554, 569-604, 1013, 1015, 1020, 1029, 1030, 1035. Treatment now included couples therapy. Tr. 540, 567-568, 1030-1032.

Progress notes from Dr. Nashara Bayón, psychologist, dated March, June, and August 2016 indicate that Peña was cooperative, alert, and oriented in person, place and time. His mood was anxious and his affect was congruent with that mood. His though process was coherent and logical. His judgment and insight were adequate. August 2016 notes also indicate that Peña was having

trouble sleeping, lacked energy and motivation to try new things, and had difficulties getting used to the CPAP machine. Dr. Bayón noted that Peña appeared to be struggling with his temperament, mood swings, and short temper. He wished to learn how to manage better his emotions and anxiety, needed a new motivation, and would like to find something that completed him, like a job, a hobby, or studies. Tr. 563-566, 569-570, 1012-1014, 1029-1030. Notes from March 2016 indicate that Peña was taking time to do mechanic work on his car and was enjoying it. Tr. 569.

Dr. Maricel Ríos, psychiatrist, noted in March and June 2016 that Peña presented moderate distress, with symptoms of sadness, irritability, insomnia, anxiety, and restlessness. He did not show panic, manic, psychotic, trauma-related, or cognitive symptoms. In September 2016, these symptoms continued except that Peña showed no distress. On mental status exam during these three appointments, Peña was oriented (in person, time, place, and situation), alert, attentive, and cooperative. His affect was congruent with his anxious and irritable mood. His thought process and association were normal, coherent, logical, and circumstantial. He showed no unusual thought content. Insight and judgment were good and his memory was intact. He had good psychiatric treatment compliance and Dr. Ríos encouraged him to keep using his current medications, to review the importance of adhering to treatment, and to continue learning mindfulness techniques. September 2016 notes also indicate that Peña's stressors were marital and family related. Tr. 996-997, 1003, 1014-1020, 1035-1040.

Dr. Ríos noted in September 2016 that Peña, in speaking about taking care of his ill mother, "is able to identify positives during this process which is a newly acquired skill. Sleep has continued to be difficult, trying hard to improve compliance with CPAP. Using [Zolpidem] pm." Tr. 997. The psychiatrist identified areas of improvement, such as being able to see the big picture and identify good things within the difficult ones, decrease frequency or verbal agitation at home, and make the effort to separate time to talk with his wife. He was to continue working on self-acceptance and forgiveness. Compliance to psychiatric treatment was good. He was encouraged to continue using his current medications and to adhere to treatment. No side effects were reported or observed. Tr. 1000-03.

**Procedural History**

In a March 2017 disability report, Peña stated having back problems and anxiety that became severe enough to keep him from working since June 30, 2012. He decided then to end his self-employment even though his medical record showed that his conditions were disabling as of

March 30, 2016. He added that "I have no other evidence of disabling conditions prior to 03/2016." Tr. 326. An interviewer noted that Peña had no difficulty hearing, reading, understanding, or answering questions, but had problems concentrating and talking. The interviewer noted that Peña had all the information on hand and answered coherently but was nervous and anxious to leave. Tr. 322.

State agency medical consultant Dr. Rafael Queipo, internist, assessed in March 2017 that the medical evidence in the record by the date last insured was insufficient for an adequate assessment, and that the record contained no reported objective findings to support a severe clinical sequel. Tr. 207. Dr. Luis Umpierre, psychologist, assessed that the evidence in record documented a medically determinable impairment of depression and anxiety that were non-severe, but the evidence was insufficient to make a proper assessment as to the impact of the condition in his functioning by the date last insured. Tr. 208.

Peña's claim was denied initially on March 24, 2017. The Notice of Disapproved Claim indicates that for the six-month time period Peña claimed disability, up to his date last insured of September 30, 2016, "[t]he evidence shows that, on the aforementioned date, none of your conditions, considered individually or in combination, limit your ability to work or there was no evidence that showed that your conditions existed." Tr. 61, 221.

Peña requested reconsideration, claiming that he felt he was distancing himself more from his family and friends and feeling irritable towards others. He lacked motivation and security in doing things. Tr. 225-226Tr. 335. An interviewer noted no limitations during an interview, including concentrating and talking. Tr. 339. In his work history report, Peña informed that in his job as an assistant appraiser, he would walk one to two hours daily, stand one to two hours, sit for six to ten hours, and write, type, or handle small objects for six to ten hours. He did not climb, stoop, crouch, kneel, crawl, reach, lift and carry weight, or handle, grab, or grasp big objects. He used machines, tools or equipment, needed technical knowledge or skills, and prepared reports. Peña did not hire, supervise, lead, or fire other people in this job. Tr. 69, 342.

For the Army supervisor mechanic job, Peña supervised a maintenance unit of light and heavy equipment. He would walk and stand for two to three hours daily; sit for one to two hours; climb, stoop, crouch, kneel, crawl, and reach for one hour each; handle, grab or grasp big objects for one to two hours and write, type, or handle small objects for three to four hours. As a mechanic, he would lift and carry parts, boxes, tools, and tires. The heaviest weight he lifted was one hundred

pounds or more, and frequently lifted twenty-five pounds. For this job, he also used machines, tools or equipment, needed technical knowledge or skills, and prepared reports. Peña supervised and lead between ten to one hundred persons during seven to twelve hours daily. Tr. 71, 344.

In his function report, Peña stated that he believed his conditions disabled him from working because "[m]y emotional instability causes me to have insecurity for working and I believe my physical limitations feed this sentiment. Sometimes I get too anxious for no apparent reason." Tr. 77, 350. He claimed that his conditions affected his ability to lift, squat, bend, kneel, complete tasks, concentrate and get along with others. How far he could walk before needing to stop and rest depended on how much pain he was in. Paying attention depended on how he was feeling. He could finish what he started and follow written and spoken instructions (he could follow spoken instructions "Quite well.") Tr. 82, 355. Peña could get along with authority figures ("I was a soldier – I respect those who respect me.") He handled stress with medications and relaxation therapy but did not handle well changes in routine. He was prescribed a CPAP, which he used almost daily. Tr. 83, 356. He took medications, with no reported side effects. Tr. 84, 357.

Peña also stated that, before, he had a normal work life and would socialize with friends. Now, he had serious trouble sleeping and rarely did his hobbies (music and auto mechanic work) because they caused anxiety when thinking of how he used to do things and would feel physical discomfort later. His daily activities consisted of getting up, taking his medication, walking on the treadmill when possible, helping with household chores, and taking his children to school and picking them up. He helped take care of his children and his mother.

He did not cook but helped with chores such as washing clothes and tidying up the house, which regularly took several hours. He did not do yard work because it caused allergies, asthma, and back pain. He did not need help with his personal care (dress, bathe, shave, feed himself, use the bathroom), and did not need to be reminded to groom or take his medicine. He would go outside almost daily, could drive a car alone, went shopping, and was able to handle money (pay bills, count change, handle a savings account, and use a checkbook or money orders). He still socialized ("I get together with some friends sometimes for a few drinks and to listen to music") weekly or every two weeks, and regularly went to church. He had problems getting along with "[w]however tells what to do and how to do it." Tr. 77-82.

In June 2017, Dr. Jeanette Maldonado, psychologist, and Dr. Vicente Sánchez, internist, assessed that there was no new medical evidence at the reconsideration level and adopted the finding of insufficient medical evidence to the date last insured. Tr. 215, 216.

On June 27, 2017, Peña's claim was denied on reconsideration, affirming the initial determination. Tr. 65, 227. Peña requested a hearing before an ALJ (Tr. 232) and claimed that as of around July 2017, his conditions changed in that he could not bend, push, reach, or carry objects over three pounds, or relate to others, leave the house, concentrate and keep attention, make decisions, engage in sports or social activities, work, or help with house chores. He could not control himself, was continuously in a bad mood, lost motivation, felt fear, was anxious and nervous all day, had crying spells, and felt worthless, tired, and restless. Tr. 361.

A hearing before ALJ Judith Torres was held on January 10, 2019. Tr. 41-59. Peña, Medical Expert ("ME") Dr. Annette De Paz, and Vocational Expert ("VE") Dr. Marieva Puig testified.

Peña testified that while in the army he started working as a mechanic and then as a supervisor of other mechanics, and afterwards as an assistant appraiser. He did not work between 2011 and 2016. Tr. 52-54. The ALJ asked Peña about his conditions in the six-month period between his alleged onset date and his date last insured. Peña testified that he had high blood pressure, sleep apnea, asthma, generalized anxiety, and depression. He used a machine to sleep, but had trouble falling asleep and slept very little. Medications sometimes helped control his high blood pressure. He was being treated for his emotional conditions since 2011, and in 2016 would alternately see a psychiatrist and a psychologist every two or three months. Since retiring from the military, he also suffered different conditions in his feet, knees, shoulders, wrists and back. He had injured his right shoulder when he was in the army and has gotten worse since. Tr. 44-50.

Peña also testified that he could no longer do the mechanic job he used to do in the military because his wrists bothered him, and he could not lift heavy things because of his back and shoulders. His right shoulder was the worse of the two. And because of his emotional conditions, he hardly left his house and was limited in his ability to spend time with others and to start tasks or finish tasks because of his anxiety and problems with his memory or concentration. He stopped seeing friends and doing activities he used to do. Also, when he couldn't breathe well because of his asthma, he could not concentrate. Tr. 47-48, 51.

The ME testified having reviewed the medical evidence and hearing Peña's testimony, and opining that Peña's mental status was adequate and that he did not have severe conditions. VA

progress notes were few and offered little information regarding treatment due to anxiety and depression. Tr. 51-52.

The VE testified that Peña worked as an appraiser from 2004 to September 2011. The job is skilled, with a Specific Vocational Preparation ("SVP") rating of seven, and light physical demand. The mechanic infantry crew member job was semiskilled, SVP of three, very heavy physical demand. The mechanic supervisor job was skilled, SVP of eight, light physical demand. Tr. 52, 55-56.

The ALJ asked the VE if a person with the same age, education, and past work as Peña and with the following restrictions could perform past work: he could lift, carry, push, pull fifty pounds occasionally and twenty-five pounds frequently; sit for a period of six hours in an eight-hour shift; stand and/or walk for six hours; frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds; frequently stoop and kneel, and occasionally crouch and crawl; could never work at unprotected heights; could frequently work with moving mechanical parts and operating a motor vehicle; could occasionally work in humidity, wetness, dust, odors, fumes, pulmonary irritants, and extreme cold or heat. The VE answered that such a person could perform Peña's appraiser job because it's a job with light physical demand and the hypothesis was at the medium level. He would not be able to perform the mechanic supervisor job as he performed it in the past, but Peña could perform the mechanic supervisor job as it appears described in the Dictionary of Occupational Titles ("DOT"), which includes only frequent work with mechanical parts. Tr. 56-57.

For the second hypothetical question, the VE asked if such a person with the following limitations could perform past work: lift, carry, push, pull twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight-hour shift; stand and/or walk for six hours; frequently reach overhead and in all other directions; occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; balance frequently; stoop, kneel, crouch, and crawl frequently; can never work at unprotected heights; can occasionally work with moving mechanical parts and operating a motor vehicle but never a commercial vehicle; occasionally work in humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and heat. The VE answered that it was a residual at the light level and that such a person could do the job of appraisal but not the mechanic supervisor job because that was at the medium level. The VE answered that his answers were consistent with the DOT. Tr. 57.

Counsel for Peña added to the second hypothetical that if that person could only have occasional contact with coworkers, supervisors, and the public, and wouldn't be able to concentrate or pay attention because of his sleep apnea, could he perform past work. The VE answered that he would not be able to work previous jobs or any job in the labor market. Tr. 58-59.

On February 15, 2019, the ALJ found that Peña was not disabled under sections 216(i) and 223(d) of the Act, through the date last insured of September 30, 2016. Tr. 29-37. The ALJ sequentially found that Peña:

(1) had not engaged in substantial gainful activity since his alleged onset date of March 30, 2016 through his date last insured (Tr. 31);

(2) had severe impairments that limited Peña's ability to perform basic work activities: sleep apnea, spine disorders, right shoulder osteoarthritis, and asthma (Tr. 31);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 33); and

(4) could perform past relevant work as an appraiser because he retained the RFC to perform light work as defined in 20 CFR 404.1567(b), except lifting, carrying, pulling and pushing twenty pounds occasionally and ten pounds frequently. He could sit for six hours, stand for six hours, and walk for six hours. He could frequently reach to the right overhead and in other directions. He could climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds. He could frequently balance, stoop, kneel, crouch, and crawl. Peña could never work at unprotected heights but could occasionally work moving mechanical parts and operate a motor vehicle (never a commercial vehicle). He could occasionally work in humidity and wetness, dust, odors, fumes, pulmonary irritants, and in extreme cold and heat. Tr. 34, 36.

The Appeals Council ("AC") denied Peña's request for review on May 23, 2019, finding no reason to review the ALJ's decision and rendering the ALJ's decision the final decision of the Commissioner. Tr. 9-13, 306-308. The present complaint followed. Docket No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step four in the sequential evaluation process that based on Peña's age, education, work experience, and RFC, he could perform previous work, thus rendering him not disabled

Case 3:19-cv-01971-BJM   Document 20   Filed 11/15/21   Page 12 of 17

Peña v. Commissioner of Social Security, Civil No. 19-1971 (BJM)                                              12

within the meaning of the Act. Peña requests that he be found disabled and granted disability benefits, or that the case be remanded to the Commissioner for reconsideration of the evidence. The Commissioner asked for the decision to be affirmed and the complaint dismissed.

Peña raises various skeletal arguments in his memorandum, and points to no evidence in the transcript on file at ECF No. 12 to back them up. Also, throughout the memorandum, two other non-related claimants and facts are named, and I wonder if the arguments raised at pages four and five of his memorandum of law found at ECF No. 10 pertain to this case. This is insufficient and sloppy, and Peña risks having his claims be deemed waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987) ("[Claimant] never directly presented a substantial evidence challenge below. He wholly failed to press this claim either in his request for remand or in his motion for reconsideration. It is, of course, settled that matters not brought to the attention of the district court are deemed waived on appeal.") Nonetheless, I will address Peña's arguments.

The first issue raised is record sufficiency to support the ALJ's RFC assessment and non-disability determination. Peña considers that the first hypothetical question to the VE was unspecific and suggestive in assuming that he could perform light work and did not consider his need for frequent changes in position and subjective complaints of pain. He also takes issue with the ALJ's depiction of his daily activities and rejection of counsel's hypothetical question posed at the hearing.

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id*. Also, when determining which work-related limitations to include in the

hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529. A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)).

The ALJ assessed that Peña retained the RFC to perform light work, but limited to lifting, carrying, pulling and pushing twenty pounds occasionally and ten pounds frequently. He could sit for six hours, stand for six hours, and walk for six hours. He could frequently reach to the right overhead and in other directions. He could climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds. He could frequently balance, stoop, kneel, crouch, and crawl. Peña could never work at unprotected heights but could occasionally work moving mechanical parts and operate a motor vehicle (never a commercial vehicle). He could occasionally work in humidity and wetness, dust, odors, fumes, pulmonary irritants, and in extreme cold and heat. The RFC finding does not include the non-exertional limitations contained in counsel's hypothetical question that the claimant could only have occasional contact with coworkers, supervisors, and the public, and wouldn't be able to concentrate or pay attention because of his sleep apnea.

Without Peña's guidance as to what evidence he believes refutes the RFC finding in his case, I reviewed the evidence in the record and found that there is substantial evidence to support the ALJ's RFC finding. The longitudinal VA medical record reveals continuous treatment (medications, diet, exercise) and follow-up appointments for a series of conditions that the ALJ acknowledged in the decision, finding four of them (sleep apnea, spine disorders, right shoulder ostearothritis, asthma) to be medically severe as per Social Security standards. All of Peña's conditions were controlled by treatment with a good response, and evaluation of his body systems were generally normal or under control. Also, the VA record does not contain medical assessments as to how Peña's conditions impact his functioning.

Peña testified that when he couldn't breathe well because of his asthma, he could not concentrate. A portion of counsel's hypothetical question is related to Peña not being able to concentrate or pay attention because of his sleep apnea, but nothing in the record supports this claim. The record shows that asthma, one of the severe conditions, was not exacerbated at any

time. In September 2016, a pulmonary care physician noted that Peña was not in respiratory distress and examination was normal. But Peña reported to the SSA that he did not do yard work because it could provoke allergies and asthma. The ALJ factored this condition in with a limitation on environmental exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants. With regards to Peña's sleep apnea, the VA record indicates he had issues getting used to the CPAP device, and would not use it as instructed. Although Peña reported to the SSA and testified that he had trouble sleeping, there are also treatment notes that Peña was sleeping regularly.

Peña also had spine disorders and low back pain, right shoulder pain, and knee problems, which limited his ability to lift heavy things. The VA record shows that treatment was conservative and that Peña reported feeling pain (three out of ten), taking his medications regularly as ordered with satisfactory results and without adverse reactions, exercising on a treadmill and being able to walk without the use of support, with some pain when going up and down stairs. In June 2016, a preventive medicine screening revealed intact range of motion, adequate muscle tone, and normal extremities. There was no gross motor and sensory deficit. His low back and hip pain was controlled and showed no red flags. The record also shows that Peña was cautious in his daily activities to not hurt his back. He reported to the SSA not doing yard work because it could cause back pain but he could do house chores.

I will also discuss Peña's mental conditions because I find that the ALJ properly rejected counsel's hypothetical question that Peña could only have occasional contact with coworkers, supervisors, and the public. The ALJ opined that the objective persuasive evidence of record did not support counsel's hypothetical question.

Peña has had extensive psychiatric and psychological treatment for moderate major depressive disorder and generalized anxiety disorder. He has had ups and downs in mood with family and marital stressors, but was under continuous supervised therapy (medications, group and individual sessions, anger management). Appointments with his VA psychologist and psychiatrist reveal that he was oriented, alert, attentive, and cooperative. His thought process was normal, coherent, logical, and circumstantial. His insight and judgment were good, and his memory was intact. He practiced mindfulness. His self-reported daily activities are also very telling, and even though Peña took issue with how the ALJ depicted them, the ALJ depicted them just as Peña reported them to the SSA. Peña reported that he felt insecure to work because of his emotional instability and paying attention depended on how he felt that day. He could finish what he started,

Case 3:19-cv-01971-BJM   Document 20   Filed 11/15/21   Page 15 of 17

Peña v. Commissioner of Social Security, Civil No. 19-1971 (BJM)                                          15

follow written and spoken instructions, get along with authority figures. He interacted with family members, friends, and strangers. He helped with house chores and took care of the children. He socialized with friends weekly or bi-weekly. He regularly went to church and would go shopping. After his claim was rejected on reconsideration and during his testimony, Peña reported inability to perform any of these things, but the treatment record does not support his newly alleged limitations.

The four State agency non-examining consultants, who reviewed the physical and mental medical record in 2017 before the ALJ did, found that the evidence was insufficient to properly assess the impact of Peña's conditions in his physical and mental functioning. Nonetheless, the ALJ reviewed the same medical evidence and after considering it along with Peña's symptoms, generously made the RFC finding of light work. The ME testified that Peña's mental status was adequate and that he did not have severe conditions, opinion to which the ALJ assigned great weight. The ALJ did not find Peña's mental conditions to be severe, as discussed at Tr. 32-33 ("paragraph B" criteria findings).

I find that the above evidence constitutes substantial evidence that supports the ALJ's RFC assessment and that the hypothetical questions presented by the ALJ were appropriate.

Peña also argues that the ALJ, as a lay person, improperly substituted his own opinion for those of medical experts, gave little weight to the treating physicians' evidence and opinions, and failed to seek additional consultative opinions. Such arguments are without merit as well. The ALJ's duty is to weigh all of the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodríguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 224 (1st Cir. 1981). The ALJ may not substitute his "own impression of an individual's health for uncontroverted medical opinion." In other words, an ALJ needs a medical expert to translate medical evidence into functional terms. *Vega-Valentín v. Astrue*, 725 F. Supp. 264, 271 (D.P.R. 2010). However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as he "does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990).

Peña blankly states that "the opinions of the treating physicians are all consistent and supportive of one another and, as such, were entitled to substantial weight" (Docket No. 10 at 6), without pointing to the court what opinions Peña believed the ALJ failed to consider. The ALJ is

Peña v. Commissioner of Social Security, Civil No. 19-1971 (BJM)                                16

responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay*, 676 F.2d at 12. It was therefore the ALJ's duty to weigh all the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodríguez*, 647 F.2d at 224. Regulations provide that the opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). As discussed above in the RFC assessment analysis, the VE record does not contain treating doctors' restriction assessments, and the ALJ made a more restrictive RFC determination than that offered by any medical source. I find that the ALJ acted properly.

As to Peña's claim that the ALJ failed to seek additional consultative opinions, while the ALJ has a duty to develop an adequate record on which reasonable conclusions may be based, *see Heggarty v. Sullivan*, 947 F.2d 990, 998 (1st Cir. 1991), Peña has not shed light on what additional information might be considered that is not already contained in the record.

Also without merit is Peña's argument that the ALJ's opinion lacked description of his education, age, and ability to understand English, and what constitutes significant numbers of a job in the national economy. The sequential evaluation in this case stopped at step four case, and the ALJ was not required to perform the step five analysis. *See* 20 C.F.R. 404.1560(b)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and you are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant number in the national economy.")

Lastly, Peña's argument that the Appeals Council erred when it refused to review the ALJ's decision despite having received additional pertinent medical evidence is unavailing. First, the Appeals Council "need not and often does not give reasons" for its decision not to review a case. *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001). Further, the council has broad latitude in deciding which cases will be reviewed. *Id.* (quoting 20 C.F.R. § 416.1470). I note that the "Notice of Appeals Council Action" indicates that "[u]nder our rules we will review your case for any of the following reasons: … We receive additional evidence that you show is new, material, and relates to the period on or before the date of the hearing decision. You must also show there is reasonable probability that the additional evidence would change the outcome of the decision." Tr. 9-10. Agency policy

provides that the Appeals Council only considers additional evidence that relates to the period on or before the date of the hearing decision, if there is reasonable probability that the additional evidence would change the outcome of the decision and if it is accompanied by an explanation showing good cause for not submitting it prior to the hearing. 20 C.F.R. § 404.970(a)(5) & (b). Peña's request for review at Tr. 306-308 contains arguments with no attached additional evidence. The Appeals Council noted that Peña "submitted reasons that you disagree with the decision. We considered the reasons and exhibited them on the enclosed Order of the Appeals Council. We found that the reasons do not provide a basis for changing the Administrative Law Judge's decision." Tr. 9. I find that the Appeals Council did not err in deciding not to review the ALJ's determination.

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (citing *Rodríguez*, 647 F.2d at 222; *Evangelista*, 826 F.2d at 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding in this case.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 15th day of November, 2021.

*s/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge